---

## IN THE UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

---

PUENTE, an Arizona nonprofit corporation; et al.,
*Plaintiffs-Appellants*

v.

CITY OF PHOENIX, a municipal corporation, et al.,
*Defendants-Appellees*
BENJAMIN MOORE, et al.,
*Defendants*

---

PUENTE, an Arizona nonprofit corporation; et al.,
*Plaintiffs-Appellees*

v.

CITY OF PHOENIX, a municipal corporation, et al.,
*Defendants,*
BENJAMIN MOORE, et al.,
*Defendants-Appellants*

---

On Appeal from the United States District Court
for the District of Arizona
No. 2:18-cv02778-JJT, Hon. John Joseph Tuchi

**BRIEF OF *AMICUS CURIAE* NATIONAL POLICE ACCOUNTABILITY PROJECT IN SUPPORT OF PLAINTIFFS-APELLEES AND PLAINTIFFS-APPELLANTS**

---

Emeritus Prof. Michael Avery
Suffolk University Law School
1219 Rockrose Rd NE
Albuquerque, NM 87122

*Counsel for Amicus Curiae*

Devontae Torriente
Lauren Bonds
National Police Accountability Project
1403 Southwest Blvd
Kansas City, KS 66103
Devontae.npap@nlg.org

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Fed. R. of App. P. 26.1, the undersigned counsel for amicus curiae respectfully submit the National Police Accountability Project (NPAP) is a non-profit organization. It has no parent corporation, and no publicly held corporation owns ten percent or more of its stock because it has no stock. Amicus does not have a financial interest in the outcome of this litigation.

# TABLE OF CONTENTS

CORPORATE DISCLOSURE STATEMENT ...........................................ii

TABLE OF CONTENTS ........................................................................iii

TABLE OF AUTHORITIES.................................................................. iv

INTEREST OF THE AMICUS CURIAE ................................................. 1

AUTHORSHIP AND PREPARATION OF THE BRIEF ......................... 2

INTRODUCTION ................................................................................. 3

ARGUMENT ........................................................................................ 4

I.     With Respect to Effecting a Fourth Amendment Seizure, There is No Meaningful Distinction Between Crowd Control with Airborne Sprays and Other Projectiles. .................................................... 4

II.    Chemical Sprays Such as Tear Gas and Pepper Spray Are Fired at Demonstrators with the Intent to Restrain Them. ................................. 11

III.   The Use of Force Against Protestors Effects a Seizure Whether the Purpose is to Compel Them to Leave or to Compel Them to Remain. .. 13

CONCLUSION ....................................................................... 20

# TABLE OF AUTHORITIES

**Cases**

*Dundon v. Kirchmeier,* 85 F.4th 1250 (8th Cir. 2023) ............................ 13

*United States v. Neill,* 166 F.3d 943 (9th Cir. 1999)............................... 6

*Heaney v. Roberts,* 846 F.3d 795 (5th Cir. 2017).................................... 18

*Jennings v. City of Miami,* 2009 WL 413110 (S.D. Fla. 2009) .............. 15

*Marbet v. City of Portland,* 2003 WL 23540258 (D. Or. 2003) .............. 16

*Otero v. Wood,* 316 F.Supp.2d 612 (S.D. Ohio 2004) .............................. 16

*Alsaada v. City of Columbus,* 536 F.Supp.3d 216 (S.D. Ohio 2021) ...... 14

*Bennett v. City of Eastpointe,* 410 F.3d 810 (6th Cir. 2005) .................. 19

*Boehner v. City of Rochester,* 609 F.Supp.3d 220 (W.D.N.Y. 2022) ....... 14

*Buck v. City of Albuquerque,* 549 F.3d 1269 (10th Cir. 2008).............. 17

*Coles v. City of Oakland,* No., 2005 WL 8177790 (N.D. Calif. 2005) ..... 16

*Flannery v. City of Rochester,* 640 F.Supp.3d 267 (W.D.N.Y. 2022) ...... 14

*Florida v. Bostick,* 501 U.S. 429, 435 (1991) .......................................... 17

*Hamilton v. City of Olympia,* 687 F.Supp.2d 1231 (W.D.Wash. 2009).. 15

*Kernats v. O'Sullivan,* 35 F.3d 1171 (7th Cir. 1994) .............................. 19

*Lamb v. City of Decatur,* 947 F.Supp. 1261 (C.D. Ill. 1996)................... 16

*Michigan v. Chesternut,* 486 U.S. 567 (1988)........................................ 17

*NAACP of San Jose v. City of San Jose,* 2021 WL 4355339 (N.D. Cal.
   Sept. 24, 2021) .................................................................................. 15

*Nelson v. City of Davis,* 685 F.3d 867 (9th Cir. 2012)............................ 13

*Puente v. City of Phoenix,* 123 F.4th 1035 (9th Cir. 2024) ........... 4, 10, 11

*Rauen v. City of Miami,* 2007 WL 686609 (S.D. Fla. 2007).................... 15

*Salmon v. Blesser,* 802 F.3d 249 (2d. Cir. 2015) .................................... 18

*Sanderlin v. Dwyer,* 116 F.4th 905 (9th Cir. 2024)................................ 13

*Torres v. Madrid,* 592 U.S. 306 (2021) ................................................... 11

*United States v. Douglas,* 957 F.3d 602 (5th Cir. 2020) ........................... 6

*United States v. Easterday,* 729 F.Supp.3d 17 (D.D.C. 2024) ................. 6

*Wallace by Wallace v. Batavia Sch. Dist. 101,* 68 F.3d 1010 (7th Cir.
   1995).................................................................................................. 19

*Youkhanna v. City of Sterling Heights,* 934 F.3d 508 (6th Cir. 2019) ... 18

**Other Authorities**

Angus Chen, *How Tear Gas Works: A Rundown of the Chemicals Used
   on Crowds*, Sci. Am. (Nov. 29, 2018),

iv

https://www.scientificamerican.com/article/how-tear-gas-works-a-rundown-of-the-chemicals-used-on-crowds/ ....................................... 7, 8

C. Gregory Smith, M.D. and Woodhall Stopford, M.D., "Health Hazards of Pepper Spray," NCMJ Sept./Oct. 1999, Vol. 60 ................................ 7

Hinds, William C., *Aerosol Technology,* (2d ed. 1999), 3. The IACP provides a similar definition: "*Aerosol restraint spray*: A chemical irritant distributed in extremely small particles as a method of less-lethal force, used to overcome resistance."........................................... 9

IACP Law Enforcement Policy Center, Aerosol Restraint Spray (2023), https://www.theiacp.org/system/files/migrated/Aerosol Restraint_Spray_02-2023.pdf .................................................... 6, 7, 8, 9

New Africa, Shutterstock, https://www.shutterstock.com/image-photo/young-woman-covering-eyes-hand-using-2175841487................ 9

R. David Tidwell & Brandon K. Wills, *Tear Gas and Pepper Spray Toxicity*, Nat'l Library of Med., Nat'l Ctr. for Biotech. Info., https://www.ncbi.nlm.nih.gov/books/NBK544263/. .............................. 7

Y.G. Karagama, J.R. Newton, C.J.R Newbegin, Short-term and long-term physical effects of exposure to CS spray, J. Royal Soc'y Med. (Apr. 2003), https://pmc.ncbi.nlm.nih.gov/articles/PMC539444/ .......... 8

# INTEREST OF THE *AMICUS CURIAE*[1]

The National Police Accountability Project (NPAP) was founded in 1999 by members of the National Lawyers Guild to address misconduct by law enforcement officers through coordinating and assisting civil rights lawyers. NPAP has approximately 550 attorney members practicing in every region of the United States, including a number of members who represent clients who experience racial discrimination from law enforcement. Every year, NPAP members litigate the thousands of egregious cases of law enforcement abuse that do not make news headlines as well as the high-profile cases that capture national attention. NPAP provides training and support for these attorneys and resources for non-profit organizations and community groups working on police and corrections officer accountability issues. NPAP also advocates for legislation to increase police accountability and appears regularly as amicus curiae in cases, such as this one, presenting issues of particular importance for its members and their clients.

[1] Counsel of record for all parties consent to the filing of this brief.

## AUTHORSHIP AND PREPARATION OF THE BRIEF

Pursuant to Fed. R. App. P. 29(a)(4)(E), amicus curiae NPAP certifies that no party or counsel for any party authored any portion of the brief, in whole or in part. No party or counsel for any party contributed money for the preparation or submission of the brief. No person, other than amicus curiae NPAP, contributed money for the preparation or submission of the brief.

# INTRODUCTION

*Amicus* agree with and support the analysis in the petition filed by plaintiffs-appellants and urge the Court to grant a rehearing *en banc*. Further, the Panel's distinction between controlling the freedom of movement of demonstrators through airborne chemical irritants and controlling their movement with other projectiles cannot be sustained. In both scenarios, the police use weapons to effect a seizure within the meaning of the Fourth Amendment. Moreover, there is no meaningful distinction between the instant case and several others cited by the Panel where the courts found there had been a seizure, including prior decisions of this Court. Thus, the Panel decision has led to a conflict within the Circuit. Finally, this Court should rule that the use of force to restrain liberty and curtail freedom of movement constitutes a seizure both when it interferes with a person's freedom to leave and when it restricts their freedom to remain.

# ARGUMENT

## I. With Respect to Effecting a Fourth Amendment Seizure, There is No Meaningful Distinction Between Crowd Control with Airborne Sprays and Other Projectiles.

On August 22, 2017, police used a variety of weapons to force demonstrators to move. Officers employed pepper balls, PAVA powder, smoke canisters, tear gas, pepper spray, pepper bullets, munitions, and "other riot control devices." *Puente v. City of Phoenix,* 123 F. 4th 1035, 1045-48 (9th Cir. 2024). Such implements of force are used interchangeably by police departments across the United States to control the movements of demonstrators. The Panel found that the officers' purpose in this case was to "clear," "drive back," and "disperse" protestors, and in some cases to injure the testicles of male demonstrators. *Id.* at 1047. Plaintiffs claimed the force was excessive and in violation of their constitutional rights.

On the question of whether the force used violated the Fourth Amendment, the Panel decision held that "dispersal of class members by the *airborne* transmission of chemical irritants (such as tear gas and pepper spray) and auditory or visual irritants (such as the sound and flash produced by flash-bang grenades) does not constitute a seizure within the meaning of the Fourth Amendment." *Id.* at 1051. On the

other hand, the Panel concluded that the "no seizure" finding with respect to the class "does not carry over" to the individual claimants who experienced a "direct physical impact from a munition." *Id.* at 1057. Plaintiff Yedlin was struck by pepper balls; Plaintiff Travis with a "muzzle blast" of chemical powder, pepper spray, and an unknown projectile; and Plaintiff Guillen with "a projectile of some kind." *Id.* 1058-1060. The Panel did not reach the question of whether Yedlin and Travis had been seized because it found the use of force against them was reasonable. As to Guillen, struck by a projectile of unknown description and able to walk away, the Panel found that viewing the record in the light most favorable to her, "the use of force against her constituted a seizure." *Id.* at 1061.

We agree with the Panel's assumption that "the diffuse airborne transmission of chemical irritants or intense flashes or sounds at a group of persons may constitute an 'application of physical force to the body of [those] person[s].'" *Id.* at 1051. That chemical sprays constitute a use of force, with results similar to other forms of force, cannot be disputed. The International Association of Chiefs of Police (IACP) plainly states: "Aerosol restraint spray is considered a use of force and

shall be employed following other compliance tactics in a manner consistent with this agency's use-of-force policy."[2] The Ninth Circuit has found that pepper spray qualifies as a "dangerous weapon," justifying a sentence enhancement under § 2B3.1(b)(2)(D) of the Sentencing Guidelines because it is "capable of inflicting death or serious bodily injury." *United States v. Neill*, 166 F.3d 943, 949 (9th Cir. 1999). *See also United States v. Douglas,* 957 F.3d 602 (5th Cir. 2020) (sustaining conviction of prison guard for deprivation of civil rights under 18 U.S.C. § 242, with four-level sentencing enhancement for using a dangerous weapon, pepper spray, and a three-level enhancement for causing bodily injury); *United States v. Easterday*, 729 F.Supp.3d 17, 21-22 (D.D.C. 2024) (upholding conviction for assault with a dangerous weapon of January 6 insurrectionist who attacked officer with pepper spray; containing extensive discussion of painful and debilitating effects including testimony of U.S. Government toxicologist that spray is "designed to cause pain … to cause tearing, to cause a toxic response" and may cause "chemical burns" with "long-term damage, and medical

---

[2] IACP Law Enforcement Policy Center, Aerosol Restraint Spray (2023), https://www.theiacp.org/system/files/migrated/Aerosol Restraint_Spray_02-2023.pdf, 1.

testimony citing "chest pain," "difficulty breathing," "wheezing" and "lung problems that just won't go away.").

Pepper spray is primarily composed of capsaicin, the spice found in chili peppers.[3] Pepper spray is commonly produced as either a concentration of natural capsaicin or a mixture of synthetic capsaicin. *Id.* Although initially created and later banned for military use, local law enforcement officers often deploy pepper spray as an aerosol or liquid, delivered via grenades, cannisters, or handheld dispensers.[4] Symptoms of pepper spray use typically appear within 20 to 60 seconds of exposure and may include "burning pain, irritation, inflammation of the eyes, respiratory tract, and skin[;] shortness of breath, chest pain, headache, dizziness, or [loss of consciousness];" and, in more severe cases, constriction of the airway between the windpipe and lungs, lung

---

[3] Angus Chen, *How Tear Gas Works: A Rundown of the Chemicals Used on Crowds*, Sci. Am. (Nov. 29, 2018), https://www.scientificamerican.com/article/how-tear-gas-works-a-rundown-of-the-chemicals-used-on-crowds/. See also, C. Gregory Smith, M.D. and Woodhall Stopford, M.D., "Health Hazards of Pepper Spray," NCMJ Sept./Oct. 1999, Vol. 60, #5.
[4] R. David Tidwell & Brandon K. Wills, *Tear Gas and Pepper Spray Toxicity*, Nat'l Library of Med., Nat'l Ctr. for Biotech. Info. (last updated May 14, 2023), https://www.ncbi.nlm.nih.gov/books/NBK544263/.

inflammation, excess fluid in the lungs, coughing up blood, asphyxia, and death. *Id.*

More specifically, skin symptoms of pepper spray usage include rashes, blisters, peeling, scaling, swelling, and burns (up to the third degree). *Id.* And, although rare in law enforcement usage, exposure may trigger intense ocular symptoms such as blood accumulation between the cornea and iris, melting of the cornea, cell death, glaucoma, cataracts, optic nerve damage, and vision loss. *Id.* Although symptoms generally resolve on their own within 10 to 30 minutes after the affected individual(s) are removed from the affected area(s) containing pepper spray, some symptoms may persist for hours after exposure. *Id.* CS gas (tear gas) "causes distressing symptoms including lacrimation, eye pain, blepharospasm, a burning sensation in the throat and nose, increased nasal secretions, chest tightness, sneezing, coughing, and retching."[5] Chemical sprays force people to move, or disable them, because they are

[5] Y.G. Karagama, J.R. Newton, C.J.R Newbegin, Short-term and long-term physical effects of exposure to CS spray, J. Royal Soc'y Med. (Apr. 2003), https://pmc.ncbi.nlm.nih.gov/articles/PMC539444/.

"engineered to cause pain."[6] Specifically, they attack pain receptors such as TRPA1 and TRPV1.[7]

Aerosol sprays cannot be distinguished from projectiles. They contain projectiles. An aerosol is a suspension of fine solid particles or liquid droplets in air or another gas.[8] So much is apparent from a photograph of pepper spray in use.[9]



The Panel did not discuss the nature of tear gas, pepper spray and other chemical agents and did not explore, in any detail, the effect that such sprays have on the human body. The foregoing discussion

---

[6] Chen, *supra* note 2.

[7] *Id.*

[8] Hinds, William C., *Aerosol Technology,* (2d ed. 1999), 3. The IACP provides a similar definition: "*Aerosol restraint spray*: A chemical irritant distributed in extremely small particles as a method of less-lethal force, used to overcome resistance." IACP, *supra* note 1, Glossary.

[9] New Africa, Shutterstock, https://www.shutterstock.com/image-photo/young-woman-covering-eyes-hand-using-2175841487.

demonstrates that such sprays may have a much greater impact on a person and on a person's freedom of movement than a glancing blow from a variety of what the Panel characterized as "projectiles."

The officers who fired pepper spray at members of the class and the officer who fired a projectile at Plaintiff Guillen had the same intent: to force them to move in the direction desired by the officer. Regardless of the specific weapons with which the officers were armed, they were all trying to do the same thing: "clear," "drive back," and "disperse" the protestors.

The Panel, however, argued that certain uses of force that involve touching a subject, either with the official's hand or briefly with a projectile, objectively manifest an intent to detain or confine the person, even temporarily, whereas the official who touches the subject's body with tear gas or pepper spray consisting of projectiles manifests no such intent. This distinction is untenable.

In the first place, *amicus* do not agree that a seizure requires an intent to detain or confine. We agree with plaintiff-appellants that an intent to interfere with liberty or freedom of movement is sufficient for a seizure.

Even assuming, however, that the focus on an intent to detain or confine were proper, the Panel's analysis does not withstand scrutiny. Take the librarian who pushes a recalcitrant patron out the door at closing time. *Puente*, at 1053. The Panel characterized that as a seizure. Imagine, however, the person standing still refusing to leave. The librarian pushes him. The person is now further from the librarian than before. She pushes him again. The person moves faster toward the door and away from the librarian and finally out the door. Where is the detention or confinement? It can only be in the instant when the librarian's hand lands on the person's shoulder. That is no different from the second when the projectiles in the pepper spray land on the protestor's face. The impact of the pepper spray on the protestor's face is no different from the impact of the projectile on the protestor's back. Or the librarian's hand pushing a shoulder.

## II.    Chemical Sprays Such as Tear Gas and Pepper Spray Are Fired at Demonstrators with the Intent to Restrain Them.

The Panel stated that "[p]laintiffs have produced no evidence that the chemical deployments at issue here were undertaken with an objective intent to restrain, such as, for example, by targeting an

immobilizing level of force at selected individuals." *Id.* at 1053. Immobilization, however, is neither required nor relevant. In *Torres v. Madrid,* 592 U.S. 306, 318 (2021), the Supreme Court made clear that a seizure may be "fleeting," and that the suspect there was seized "the instant that the bullets struck her."

All that is required for a seizure is use of force against the body with an objective manifestation of an intent to "restrain." *Amiusi* agree with and adopt plaintiff-appellants' analysis of what constitutes an intent to restrain. With respect to interfering with liberty and freedom of movement, there is no difference between shooting protestors with tear gas, pepper spray, pepper balls, or rubber bullets. All are capable of rendering the targets incapable of moving or of forcing the targets to move. All interfere equally with the targets' liberty and freedom to move. All are used interchangeably by police departments for the same purpose: to break up crowds of protestors. It defies common sense that shooting protestors with a chemical spray that may cause pain, irritation, inflammation, shortness of breath, chest pain, headache, dizziness, constriction of the airway between the windpipe and lungs, lung inflammation, excess fluid in the lungs, coughing up blood,

asphyxia, death and rashes, blisters, peeling, scaling, swelling, and burns would not constitute a seizure.

### III. The Use of Force Against Protestors Effects a Seizure Whether the Purpose is to Compel Them to Leave or to Compel Them to Remain.

Defense lawyers across the country who represent police officers who have used excessive force to disperse protestors have repeatedly claimed that removing demonstrators from a space is not a seizure under the Fourth Amendment. They argue that as long as the subject is "free to leave" he has not been seized. See, e.g., *Dundon v. Kirchmeier,* 85 F.4th 1250 (8th Cir. 2023).

Until the Panel decision in *Puente*, this Court had firmly rejected that argument. *Sanderlin v. Dwyer,* 116 F.4th 905, 912-13 (9th Cir. 2024) ("courts have not hesitated to hold that a seizure occurred when an officer uses physical force in any way that restricts or otherwise limits the ability of an individual to move about freely, even if the restriction is limited in nature or time, and even where the force is not applied for the purpose of effectuating an arrest"; "A reasonable trier of fact viewing this evidence could conclude that by firing a 40mm projectile at Sanderlin's groin, [the officer] objectively manifested an

intent to restrain Sanderlin. Whether [the officer] may have subjectively intended to repel Sanderlin rather than restrain him is irrelevant to the analysis."); *Nelson v. City of Davis,* 685 F.3d 867, 877-78 (9th Cir. 2012) ("Whether the officers intended to encourage the partygoers to disperse is of no importance when determining whether a seizure occurred. The officers took aim and fired their weapons towards Nelson and his associates. Regardless of their motives, their application of force was a knowing and willful act that terminated Nelson's freedom of movement. It unquestionably constituted a seizure under the Fourth Amendment.")

The argument that using force to disperse protestors does not constitute a seizure has been rejected by other courts as well. *Flannery v. City of Rochester,* 640 F.Supp.3d 267, 280 (W.D.N.Y. 2022) ("Courts have routinely concluded that the use of [military-grade weapons and chemical weapons] against protestors constitutes a seizure for purposes of the Fourth Amendment"); *Boehner v. City of Rochester,* 609 F.Supp.3d 220, 229 (W.D.N.Y. 2022) (sustaining Fourth Amendment claim where police used pepper spray and tear gas to disperse peaceful protestors); *Alsaada v. City of Columbus,* 536 F.Supp.3d 216, 265 (S.D.

Ohio 2021), modified with respect to the terms of the preliminary injunction by *Alsaada v. City of Columbus, Ohio,* 2021 WL 3375834 (S.D. Ohio 2021), (holding that protestors were seized by force and by control when their freedom of movement was terminated by munitions fired by law enforcement to disperse them; on a motion for a preliminary injunction finding a likelihood of success on the merits "that the deployment of less-lethal munitions constituted physical force that temporarily restrained the protestors"); *NAACP of San Jose v. City of San Jose*, No. 2:20-CV-3431, 2021 WL 4355339 (N.D. Cal. Sept. 24, 2021) (individuals shot by munitions fired by officers attempting to disperse the crowd at a protest suffered a Fourth Amendment seizure although they were not taken into custody); *Hamilton v. City of Olympia*, 687 F.Supp.2d 1231, 1241 (W.D.Wash. 2009) (rejecting argument that subject must be arrested to be seized; viewing evidence in light most favorable to plaintiff, protestor's freedom of movement was terminated when he was struck with pepper spray); *Jennings v. City of Miami,* No. 07-23008-CIV-MARTINEZ-BROWN, 2009 WL 413110 (S.D. Fla. 2009) (holding that herding demonstrators by firing tear gas, pepper spray, shotgun-based projectiles, and other weapons constituted

a termination of movement and thus a seizure); *Rauen v. City of Miami, No. 06-21182-CIV-ALTONAGA/Turnoff,* 2007 WL 686609 (S.D. Fla. 2007) (holding that herding demonstrators to disperse them from one area into another by means of batons, pepper spray, OC spray rounds, pepper spray balls, bean bags, and tear gas and constituted termination of their freedom of movement and a seizure); *Coles v. City of Oakland*, No. C03-2961 TEH; NO. C03-2962 THE, 2005 WL 8177790, at *5 (N.D. Calif. 2005) (holding that using wooden bullets, bean bags, grenades, batons, and motorcycle hits to terminate protestors' freedom of movement and force them away from an area in a single direction constituted a seizure, "a person may be seized without becoming completely immobile or being forced to remain in one location," and intent to arrest is not required); *Otero v. Wood*, 316 F.Supp.2d 612 (S.D. Ohio 2004) (holding that firing into an unruly crowd and striking plaintiff with a wooden baton meant to have been skipped along the ground but in this instance fired directly into plaintiff's face constituted a Fourth Amendment violation for the use of excessive force); *Marbet v. City of Portland,* No. CV 02-1448-HA, 2003 WL 23540258, at *10 (D. Or. 2003) (holding that firing pepper spray and rubber bullets at protestors

that restrained their freedom of movement constituted a seizure and rejecting argument that because protestors were able to walk away there was no seizure); *Lamb v. City of Decatur*, 947 F.Supp. 1261 (C.D. Ill. 1996) (holding that allegations that police sprayed labor demonstrators with tear gas stated a valid Fourth Amendment claim). *See also*, *Buck v. City of Albuquerque,* 549 F.3d 1269 1289 (10th Cir. 2008) (recognizing excessive force claim by protestor who was not arrested but was immobilized by tear gas and pepper balls). It flies in the face of the Constitution to argue that a peaceful protestor exercising First Amendment rights has less protection for their bodily integrity than a murderer being placed under arrest.

As early as 1991, the Supreme Court held that whether one is "free to leave" is not always the appropriate test of whether there has been a seizure. *Florida v. Bostick,* 501 U.S. 429, 435 (1991). In circumstances in which the "free to leave" test is inappropriate, the Court said the test was "whether a reasonable person would feel free to decline the officers' requests or otherwise terminate the encounter." *Id.* at 436. The Court noted that it had previously defined the "crucial test" as "whether, taking into account all the circumstances surrounding the

encounter, the police conduct would 'have communicated to a reasonable person that he was not at liberty to ignore the police presence and go about his business.'" *Id.* at 437. (citing *Michigan v. Chesternut*, 486 U.S. 567, 569 (1988). More recently, in *Brendlin v. California,* 551 U.S. 249, 254 (2007), the Court stated that a person is seized when an officer "'by means of physical force or show of authority,' terminates or restrains his freedom of movement 'through means intentionally applied.'"

Courts that have followed the Supreme Court's rejection of the "free to leave" argument have held, in a variety of circumstances, that the use of force or a show of authority to compel a person or a group of people to leave or disperse constitutes a seizure. *See Youkhanna v. City of Sterling Heights*, 934 F.3d 508, 523 (6th Cir. 2019) (holding where painful force beyond mere "guiding force" is used to eject person from public meeting there would be a Fourth Amendment seizure); *Salmon v. Blesser*, 802 F.3d 249, 251 (2d. Cir. 2015) (holding that police officer removing plaintiff from courthouse by grabbing him by his collar, twisting his arm behind his back, and shoving him toward the door is a seizure; "where, as here, an official uses physical force to effect the

ejection, so that for a time, however brief, he intentionally restrains the person and controls his movements, a plaintiff can plausibly plead a seizure subject to the Fourth Amendment's reasonableness requirement"); *Heaney v. Roberts,* 846 F.3d 795, 804-05 (5th Cir. 2017) (holding forceful removal from public meeting was a seizure); *Bennett v. City of Eastpointe,* 410 F.3d 810, 834 (6th Cir. 2005) (holding that ordering Black youth on bicycle to leave neighboring suburb and return to Detroit constitutes a seizure because "Fourth Amendment jurisprudence suggests a person is seized not only when a reasonable person would not feel free to leave an encounter with police, but also when a reasonable person would not feel free to *remain* somewhere, by virtue of some official action." (emphasis in original)); *Wallace by Wallace v. Batavia Sch. Dist. 101,* 68 F.3d 1010 (7th Cir. 1995) (holding that a teacher grabbing a student's elbow and wrist to remove her from the classroom is a Fourth Amendment seizure); *Kernats v. O'Sullivan*, 35 F.3d 1171 (7th Cir. 1994) (holding that a police officer demanding that tenants vacate premises is a seizure because a seizure might arise not only because a person is not free to leave a location, but also because they are not free to remain).

## CONCLUSION

For the foregoing reasons, *amicus* request this Court to vacate the

Panel decision and set the case for rehearing *en banc*.


Respectfully submitted,
National Police Accountability Project

/s/ Michael Avery
Emeritus Prof. Michael Avery
Suffolk University Law School
1219 Rockrose Rd NE
Albuquerque, NM 87122
(617) 335-5023

## CERTIFICATE OF COMPLIANCE

In accordance with Federal Rule of Appellate Procedure 32(a)(7)(C) and Circuit Rule 32-1(e), I certify that this brief: (i) complies with the type-volume limitation of Circuit Rule 29-2(c)(2) because it contains about 3,578 words, including footnotes and excluding the parts of the brief exempted by Rule 32(f) and complies with the typeface requirements of Rule 32(a)(5) and the type-style requirements of Rule 32(a)(6) because it has been prepared using Microsoft Office Word 16.75, set in Century Schoolbook 14 point type.

/s/ Michael Avery

**CERTIFICATE OF SERVICE**

I certify that on March 7, 2025, this brief was filed using the

Court's CM/ECF system. All participants in the case are registered

CM/ECF users and will be served electronically via that system.

/s/ Michael Avery